UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
David LaChapelle, et al.,                                :

                 Plaintiffs,       :

        -v-                             :

Fred Torres, et al.,                                     :

               Defendant.        :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 2 8 201

12 Civ. 09362 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

      Before the Court are Third-Party Defendants Michael Anderson and Ghretta Hynd's

motions to dismiss the third-party claims against them in this action due to lack of personal

jurisdiction. According to the Counterclaims, Torres is the owner of Fine Art Account, Inc,

doing business as Fred Torres Collaborations ("FTC"), a New York corporation with its principal

place of business in New York City. (Counterclaims at ¶¶ 1-2). FTC operates an art gallery and

acts as an artist agent and manager, formerly representing pop-culture photographer David

LaChapelle and David LaChapelle Studios, Inc. ("DLC Studios"). (Counterclaims ¶¶ 1, 17, 19,

65). Specifically, in 2008, FTC entered into a representation agreement with DLC Studios and

LaChapelle which provided that FTC would act as LaChapelle's exclusive agent.

(Counterclaims ¶¶ 19-20). At some point, the relationship between Torres and LaChapelle

deteriorated and, according to the Counterclaims, in mid-2012 DLC Studios and LaChapelle

allegedly took a number of steps to steal FTC's business and to improperly terminate the

representation agreement. (Counterclaims ¶¶ 50-72). The claims against Anderson and Hynd

are related to this primary dispute, particularly in that they are alleged to have wrongfully

interfered with FTC's business and misappropriated certain confidential information from Torres

and FTC.

## I.  LEGAL STANDARD

Hynd and Anderson move to dismiss, claiming that they are not subject to personal jurisdiction under New York's long-arm statute and that, even if they were, the exercise of such jurisdiction would violate due process.  Thus, the Court engages in a two-step inquiry in which it first examines whether Hynd and Anderson are subject to jurisdiction under the law of New York and then considers whether jurisdiction comports with due process under the United States Constitution.[1]  *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013).

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.  *Id.* at 167.  On this procedural posture, the Court construes the pleadings and any supporting materials in the light most favorable to the plaintiffs, resolving any doubts in favor of jurisdiction.  *Id.*; *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012); *see also Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) ("At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations."); *Southern New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (explaining that a plaintiff may satisfy the requirement of a prima facie showing by providing an averment of facts that, if credited, would suffice to establish jurisdiction).  However, the Court does not draw "argumentative inferences" in plaintiff's favor nor does it accept as true a legal conclusion couched as a factual allegation.  *Licci*, 673 F.3d at 59.

## II.  PERSONAL JURISDICTION UNDER NEW YORK LAW: HYND

Torres and FTC claim that jurisdiction exists over Hynd through C.P.L.R. §§ 302(a)(2)

---

[1] Counterclaim Plaintiffs do not argue that Hynd or Anderson are subject to general jurisdiction in New York.  The Court also notes that neither Hynd nor Anderson has moved to dismiss for failure to state a claim and the Court, therefore, does not consider whether the claims against them are adequately pleaded.

and (3) based on her alleged tortious conduct against FTC.

## A. Hynd's Role in the Alleged Tortious Conduct and Contacts with New York

Among other things, the Counterclaims in this action allege that Hynd, an employee of DLC Studios, a New York corporation, "converted FTC's customer's lists and other proprietary data from FTC's computers and files." (Counterclaims ¶¶ 3, 5, 53). Specifically, Torres claims that in late November 2012, Counterclaim Defendants Kumi Tanimura (a DLC Studios employee then working in FTC's office) and Michael Mockler (a former FTC employee now working for DLC Studios) stole a computer server with three separate databases containing information on FTC's sales of artwork, FTC's client list, and Torres's personal rolodex. (Counterclaims ¶¶ 6-7; Torres/Hynd Decl. ¶ 6).[2]  Torres then called LaChapelle, who called Hynd on his cellphone, placing the call on speakerphone so that Torres could hear. (Torres/Hynd Decl ¶ 7). On this call, Hynd "admitted that she had directed the theft of [the server] but claimed that the taking of [two of the databases] was a 'mistake' and that they would be returned." (Torres/Hynd Decl. ¶ 7). These materials were never returned. (Torres/Hynd Decl. ¶ 8).

According to the Counterclaims, Hynd also directed several of FTC's employees—whom DLC Studios had offered employment—to steal certain artworks that FTC had fabricated as well as other property being stored at Cirkers, a fine art storage facility in New York City. (Counterclaims ¶ 56; Torres/Hynd Decl. ¶ 10). Torres has submitted emails as an exhibit to his declaration that suggest that Hynd did coordinate with at least one FTC employee regarding the removal of artwork from the Cirker's facility and in which that employee refers to "stalling"

---

[2] Citations to "Torres/Hynd Decl. ¶ __" are to the Declaration of Fred Torres in Opposition to Defendant Ghretta Hynd's Motion to Dismiss. Citations to "Torres/Anderson Decl. ¶ __" are to the Declaration of Fred Torres in Opposition to Defendant Michael Anderson's Motion to Dismiss.

Torres to hear what Hynd wanted to do regarding the storage facilities. (Torres/Hynd Decl. ¶ 10 & Ex. B). Viewed in the light most favorable to Torres, this email may corroborate his allegations of Hynd's role in this claimed theft. Likewise, Torres claims that Hynd instructed at least one individual whom had been loaned artwork by FTC to return that artwork to DLC Studios rather than FTC. (Torres/Hynd Decl. ¶ 11 & Exs. C, D).

Finally, the Counterclaims allege that certain of the Counterclaim Defendants directed certain of FTC's customers to remit payment to DLC Studios rather than to FTC. (Counterclaims ¶¶ 41-43, 51, 60). Torres claims in his declaration that he "believe[s] that Hynd has been involved" in this alleged wrongdoing, but submits no evidence in support of this claim. (Torres/Hynd Decl. ¶ 12).

In response, Hynd claims she cannot be subject to personal jurisdiction in New York because of her limited contacts with the state: she is an Oregon resident where she votes, pays taxes, works, and holds a drivers license. (Hynd Decl. ¶ 2). She claims she has no personal contact with New York, including that she pays no New York taxes; does not own property in state; is not registered to vote in New York; does not receive government benefits from New York; does not have a New York bank account, address, driver's license, or telephone number; does not operate businesses in New York; and has not availed herself of the New York court system. (Hynd Decl. ¶ 3). As for her employment with DLC Studios, she notes that she is the "controller" of that New York-based entity, which pays her a set salary, and that her responsibilities include payroll, human resources, and certain financial activities. (Hynd Decl. ¶¶ 4-5). She further claims, however, that she is not an officer or director of DLC Studios and has limited authority to act on DLC Studios behalf. (Hynd Decl. ¶¶ 4-5).

In response, Torres attests that, in his experience, Hynd was extensively involved in the

day-to-day operations of DLC Studios and that "there was not a single major decision at DLC with which Ms. Hynd was not involved." (Torres/Hynd Decl. ¶ 3). Indeed, the Counterclaims allege that "[u]pon information and belief, Hynd is the CFO or its equivalent at DLC Studios." (Counterclaims ¶ 5). Torres further notes that Hynd admits that she had regular written and electronic communications with FTC's employees in New York and travels to the New York offices one or two times per year. (Hynd Decl. ¶ 7; Torres/Hynd Decl. ¶ 4). He states that in November 2012 alone, Hynd "sent 666 separate emails relating to all aspects of DLC's business relations with FTC." (Torres/Hynd Decl. ¶ 4).

### B. Long-Arm Jurisdiction

1.   Conversion of Computer Server and Other Items: C.P.L.R. § 302(a)(2).

Torres and FTC's first basis for asserting long-arm jurisdiction over Hynd is through C.P.L.R. § 302(a)(2), which provides for personal jurisdiction over claims arising from the conduct of a non-domiciliary who "commits a tortious act within the state." As Hynd points out, however, §302(a)(2) typically requires that the defendant have been physically present in New York while committing the tortious act. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (explaining that "C.P.L.R. § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act" and holding that acts of trademark infringement not committed in New York but causing injury in New York did not give rise to jurisdiction under §302(a)(2)); *see also Overseas Media, Inc. v. Skvortsov*, 277 Fed. Appx. 92, at *95 (2d Cir. May 8, 2008) ("[T]he two alleged offers to sell rights to Nastoyashie Menty were not tortious acts committed within the state because the defendants were not physically present in New York when they committed the putative tort."); *Japan Press Serv. v. Japan Press Serv.*, No. 11-cv-5875, 2013 U.S. Dist. LEXIS 2163, at *27

(E.D.N.Y. Jan. 2, 2013) ("'Even if [a plaintiff] suffered injury in New York, that does not

establish a tortious act in the state of New York within the meaning of Section 302(a)(2).'"

(quoting *Bensusan*, 126 F.3d at 28)); *Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418,

430 (E.D.N.Y. 2012) ("The Second Circuit has held that the law in New York State with regard

to personal jurisdiction under Section 302(a)(2) is clear: personal jurisdiction arises under this

section only pursuant to actions taken while physically within New York State."); *Ahava Food

Corp. v. Donnelly*, No. 02-cv-6031, 2002 U.S. Dist. LEXIS 23731, at *7 (S.D.N.Y. Dec. 9, 2002)

(explaining that personal jurisdiction did not arise under § 302(a)(2) with regard to tortious

interference claims because defendant was not physically present and "communication by post or

telephone from outside of New York into New York is not an act committed 'within the state'

for the purposes of § 302(a)(2).").  There is no evidence or allegation that Hynd committed any

of the alleged torts while she was herself present in New York.

However, New York courts have recognized that jurisdiction under § 302(a)(2) may

extend to out-of-state individuals who did not themselves commit a tort while physically present

in New York but who can be deemed responsible for such a tort based upon theories of agency or

conspiracy.  *See In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y.

2013); *Emerald Asset Advisors*, 895 F. Supp. 2d at 430.  In other words, if a tort is committed by

a person who is physically present in New York but who is acting as an agent of or co-

conspirator with an out-of-state individual, courts may attribute the in-state acts to an out-of-state

defendant for the purposes of obtaining personal jurisdiction.  *See In re Satyam Computer Servs.

Sec. Litig.*, 915 F. Supp. 2d at 484; *Emerald Asset Advisors*, 895 F. Supp. 2d at 430.  "Whether a

defendant's representative is an 'agent' for purposes of § 302(a) hinges on whether the

representative acted 'for the benefit of and with the knowledge and consent of [the] defendant

and [the defendant] exercised some control over [the agent] in the matter.'" *Emerald Asset Advisors*, 895 F. Supp. 2d at 430 (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Courts have regarded jurisdiction based on conspiracy as a subspecies of the agency rationale for jurisdiction. *See Emerald Asset Advisors*, 895 F. Supp. 2d at 431; *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-cv-488, 2012 U.S. Dist. LEXIS 119206, at *19 (S.D.N.Y. Aug. 15, 2012). To prove personal jurisdiction under a theory of conspiracy, "a plaintiff must make a *prima facie* showing of a conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy." *Emerald Asset Advisors*, 895 F. Supp. 2d at 431 (quotation marks omitted); *Sea Trade Mar. Corp.*, 2012 U.S. Dist. LEXIS 119206, at *19. As to the prima facie case of conspiracy, the Court considers whether Torres and FTC have alleged a primary tort and the four elements of conspiracy: "1. a corrupt agreement between two or more parties; 2. an overt act in furtherance of the agreement; 3. the parties intentional participation in the furtherance of the plan or purpose; and 4. the resulting damage or injury." *Emerald Asset Advisors*, 895 F. Supp. 2d at 432; *Sea Trade Mar. Corp.*, 2012 U.S. Dist. LEXIS 119206, at *20. Moreover, as to a defendant's membership in the conspiracy, the Court considers whether "(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Emerald Asset Advisors*, 895 F. Supp. 2d at 433 (quotation marks omitted); *Sea Trade Mar. Corp.*, 2012 U.S. Dist. LEXIS 119206, at *23.

Hynd argues that Counterclaim Plaintiffs' efforts to prove jurisdiction over her fail because the Counterclaims do not adequately allege a theory of agency or conspiracy as the basis

for personal jurisdiction. (Hynd Reply at 6). Courts have been clear, however, that the Complaint need not expressly allege participation in a conspiracy and, in this case, the Counterclaims and Torres's declaration sufficiently allege facts to support a conclusion that Hynd either conspired with or used Tanimura and Mockler as her agents to obtain the computer server and other items subject to Counterclaim Plaintiffs' conversion claims. *See In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013) ("While neither complaint officially charges the Officer Defendants and the Maytas Defendants with participation in a conspiracy, the FACC and the SAC both allege sufficient facts to support an inference that the Maytas Defendants participated in a conspiracy to violate section 10(b) . . . ."); *cf. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 793 (2d Cir. 1999) (affirming district court's refusal to apply these doctrines where they were not alleged in the complaint and all that plaintiffs provided in support of their arguments were conclusory statements).

Specifically, the Counterclaims allege—and Torres's declaration corroborates—that the conduct underlying the primary torts, the alleged theft of the computer server and various other items, was at Hynd's direction and, in fact, may have been motivated by offers of employment at DLC Studios. *See Emerald Asset Advisors*, 895 F. Supp. 2d at 432-33; *Sea Trade Mar. Corp.*, 2012 U.S. Dist. LEXIS 119206, at *20-21 (noting that the lack of an express allegation of agreement is not fatal to a conspiracy claim and that such an agreement may be inferred from conduct). Hynd's request that these items be stolen and the alleged theft of these items constitute overt acts in furtherance of this implied agreement. *See Sea Trade Mar. Corp.*, 2012 U.S. Dist. LEXIS 119206, at *21. Likewise, these same facts suggest an intentional participation in the plan, *see Emerald Asset Advisors*, 895 F. Supp. 2d at 432; *Sea Trade Mar. Corp.*, 2012 U.S. Dist.

LEXIS 119206, at *21-22, and the resulting damage to Torres and FTC is obvious.

The allegations similarly establish that Hynd knew that these activities would have effects in New York, as the computer server and other items were housed in New York at the time, and FTC is based in New York. *See Andre Emmerich Gallery, Inc. v. Segre*, No. 96-cv-889, 1997 U.S. Dist. LEXIS 16899, at *15-16 (S.D.N.Y. Oct. 27, 1997). Likewise, the Counterclaims expressly allege that Tanimura and Mockler acted at Hynd's behest. Finally, viewing the submissions in the light most favorable to Counterclaim Plaintiffs and resolving any doubts their favor, the Court concludes that Torres and FTC have made a sufficient showing that these actions were for Hynd's benefit. In particular, the allegations suggest that Hynd was the central driving force behind the conspiracy as the person who directed the alleged thefts and that she may have stood to benefit from these acts based on her allegedly extensive involvement with DLC Studios. *See Emerald Asset Advisors*, 895 F. Supp. 2d at 432-33 (noting the "oft cited proposition in conspiracy law that a conspiracy can rarely be proved by direct evidence," and noting that the actions of one defendant were a "critical and necessary part of the scheme to defraud" in inferring that defendant's role in the conspiracy); *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 446-47 (S.D.N.Y. 2000) (finding sufficient evidence of a conspiracy based on circumstantial evidence and the conduct of the relevant actors); *Andre Emmerich Gallery, Inc.*, 1997 U.S. Dist. LEXIS 16899, at *16 (finding it was "possible to infer . . . that defendant stood to benefit financially" from the conspiracy based on, among other things, his assistance in the conspiracy and his "intimate involvement" with the operation of the business that stood to benefit); *Dixon v. Mack*, 507 F. Supp. 345, 351 (S.D.N.Y. 1980) (noting that the benefit need not be financial and that the requisite benefit accrues when the New York co-conspirators realize the goals of the conspiracy). Although subsequent discovery may refute

these claims, Counterclaim Plaintiffs have met their limited burden at this stage.

Hynd also argues that this Court cannot exercise personal jurisdiction over her because her actions were made in her corporate capacity and for the benefit of DLC Studios. (Hynd Mot. at 6-8). However, New York has expressly rejected the "fiduciary shield" doctrine upon which this argument is founded, thereby rejecting the view that an individual may not be subject to jurisdiction if her dealings in the forum state were solely in a corporate capacity. *See Kreutter*, 71 N.Y.2d 460, 467-72; *see also Schindler v. Lyon*, No. 12-cv-5928, 2013 U.S. Dist. LEXIS 122545, 16-17 (E.D.N.Y. Aug. 28, 2013); *Pilates, Inc. v. Current Concepts*, 1996 U.S. Dist. LEXIS 15415, at *6 (S.D.N.Y. Oct. 17, 1996) ("The fiduciary shield doctrine has been abolished in New York, and corporate officers who transact business or commit a tort in New York while acting on behalf of their employer are subject to personal jurisdiction in New York.").[3]

2.  Tortious Interference Claims

Because long arm personal jurisdiction applies only to "a cause of action arising from any of the acts enumerated" by C.P.L.R. §302(a), the above analysis suffices only to establish personal jurisdiction over those claims that relate to the alleged conspiracy to misappropriate the computer server and items in the Cirker's storage facility. Torres and FTC assert two further claims against Hynd for tortious interference with contract based on (1) her direction to at least one New York individual to return artwork to DLC Studios rather than FTC and (2) her direction to at least one New York-based customer of FTC to remit payment to DLC Studios rather than FTC. (Torres/Hynd Opp. at 3).

---

[3] The cases that Hynd relies on are not to the contrary. *Laufer v. Ostrow*, 55 N.Y.2d 305, 313-14 (1982) merely held that general jurisdiction under C.P.L.R. § 301 over a corporation did not provide jurisdiction over its officers. *Pramer S.C.A. v Abaplus Intl. Corp.*, 76 A.D.3d 89, 95-96 (N.Y. App. Div. 1st Dep't 2010) relied on *Laufer* and found an absence of evidence to support jurisdiction over the individual defendants; to the extent it could be read as supporting Hynd's position, it is contrary to *Kreutter*.

Counterclaim Plaintiffs first argue that personal jurisdiction exists over Hynd as to these causes of action under § 302(a)(2), notwithstanding that she was not physically present in New York when she made the communications giving rise to these claims. (Torres/Hynd Opp. at 6-7). However, as noted above, the Second Circuit has made clear that this provision of New York law reaches only defendants who are physically present in New York when they commit the wrongful act. *See Bensusan*, 126 F.3d at 28.[4]

Counterclaim Plaintiffs next urge that C.P.L.R. § 302(a)(3)(ii) gives rise to personal jurisdiction over Hynd as to these claims, contending that she has "commit[ted] a tortious act without the state causing injury to a person or property within the state." As pertinent to this action, jurisdiction under this provision also requires a showing that Hynd "expects or reasonably should expect the act to have consequences in the state and derives substantial revenue from interstate . . . commerce." C.P.L.R. § 302(a)(3)(ii).

As a preliminary matter, the Court notes that, applying  the situs-of-the-injury test that governs whether a tortious act has caused injury in New York under §302(a)(ii), the allegations suffice to meet Hynd's burden at this stage that New York was the location of the relevant injury. *See United Mobile Techs., LLC v. Pegaso PCS*, 509 Fed. Appx. 48, 50 (2d Cir. Jan. 30, 2013) (unpublished) (noting that "[c]ourts usually find the situs of the injury, in tortious interference actions, is where the company 'lost business,'"); *Park West Galleries, Inc. v. Franks*, No. 12-cv-3007, 2012 U.S. Dist. LEXIS 86629, at *11-12 (S.D.N.Y. June 20, 2012); *Kargo, Inc. v. Pegaso*

---

[4] *Banco Nacional Ultramarino, S.A. v. Chan*, 169 Misc. 2d 182 (1996), upon which Torres and FTC rely, pre-dates and is contrary to *Bensusan*. *See, e.g.*, *Panacea Solutions, Inc. v. Roll*, No. 05-cv-10089, 2006 U.S. Dist. LEXIS 79645, at *12-13 (S.D.N.Y. Oct. 31, 2006); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, No. 03-cv-1681, 2004 U.S. Dist. LEXIS 19614 at *41 n.13 (S.D.N.Y. Sept. 29, 2004). The other case on which Counterclaim Plaintiffs rely, *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 358 (S.D.N.Y. 2007), is inapposite because it was applying C.P.L.R. § 302(a)(1) which relates to the transaction of business in New York and does not require physical presence.

*PCS, S.A.*, No. 05-cv-10528, 2008 U.S. Dist. LEXIS 57472, at *24 (S.D.N.Y. July 28, 2008).

Indeed, nowhere in her motion papers does Hynd dispute that her actions in directing at least one

New York-based customer to remit payment to DLC Studios and a different New York-based

individual to return a fabricated work to DLC Studios, rather than FTC, caused a tortious injury

in New York. (Hynd Mot. at 8-9; Hynd Reply at 8-9). For the same reasons, the Court

concludes that the allegations are sufficient to show that she reasonably should have expected

these acts to have consequences in New York.

The remaining question, then, is whether Counterclaim Plaintiffs have sufficiently

alleged that Hynd derives "substantial revenue" from interstate commerce. Hynd argues that the

mere receipt of salary from a New York corporation for services she rendered while in Oregon

does not constitute interstate commerce, citing *Doe v. Del. State Police*, 939 F. Supp. 2d 313,

330-31 (S.D.N.Y. 2013) and *Ziegler, Ziegler & Assocs. LLP v. China Digital Media Corp.*, No.

05-cv-4960, 2010 U.S. Dist. LEXIS 84506, at *16-19 (S.D.N.Y. July 12, 2010). Neither of these

cases support this proposition.

*Doe* held that the plaintiffs in that case had failed to establish substantial revenue derived

from interstate commerce under § 302(a)(3)(ii) where the alleged revenue was in the form of

"traffic tickets, fines, bail, licenses, donation and permits." *Doe*, 939 F. Supp. 2d at 331.

Explaining that these were merely the regular tasks of a local police department, the court held

they were "arguably not 'commerce' . . . and certainly not 'interstate.'" *Id.* Likewise, *Ziegler*

held only that investment capital derived from the sale of stock shares is not "revenue" because it

is not profit from sales, and thus turned on the definition of "revenue" rather than whether the

defendants engaged in "interstate commerce." *Ziegler*, 2010 U.S. Dist. LEXIS 84506, at *17-19.

Deriving payment, even in the form of a salary, from a New York corporation for

services performed in Oregon (with regular contact with DLC Studios in New York and periodic travel to New York) is simply not analogous to the acts in *Doe* or *Ziegler*. *Cf. Bensusan Restaurant Corp.*, 126 F.3d at 29 (explaining that the purpose of the interstate commerce requirement was to exclude non-domiciliaries from jurisdiction where their business operations are of a local character); *Parker Waichman Alonso LLP v. Orlando Firm, P.C.*, No. 09-cv-7401, 2010 U.S. Dist. LEXIS 47957, at *28-29 (S.D.N.Y. May 14, 2010); *Foot Locker Retail, Inc. v. SBH, Inc.*, No. 03-cv-5050, 2005 U.S. Dist. LEXIS 599, at *14-15 (S.D.N.Y. Jan. 18, 2005). Indeed, *Ziegler* undermines Hynd's argument that because she is not selling goods she is not engaged in interstate commerce (Hynd Mot. at 9), as it explains that the selling of services will also constitute interstate commerce. *Ziegler*, 2010 U.S. Dist. LEXIS 84506, at *18.

Torres and FTC, however, fail to allege—or even argue—that the revenue that Hynd derives from the interstate provision of her services as "controller" of DLC Studios is "substantial." *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 150-51 (2d Cir. 2011) (holding that it is error to excuse the plaintiff from making a showing substantial revenue); *Upstate Networks, Inc. v. Early*, No. 11-cv-1154, 2012 U.S. Dist. LEXIS 119516, at *21-22 (N.D.N.Y Aug. 23, 2012). Nevertheless, based on the showing made thus far, the Court finds that discovery into this point is warranted and, therefore, declines to dismiss these claims. *See, e.g.*, *Drake v. Lab. Corp. of Am. Holdings*, No. 02-cv-1924, 2007 U.S. Dist. LEXIS 17430, at *33-34 (E.D.N.Y. Mar. 13, 2007).

### III. PERSONAL JURISDICTION UNDER NEW YORK LAW: ANDERSON

#### A. Anderson's Role in the Alleged Tortious Conduct and Contacts with New York

Anderson's involvement in this suit is more limited than Hynd's. In particular, the claims against Anderson are that he "converted confidential financial information relating to defendants

Torres and FTC and provided the same to [DLC Studios and LaChapelle] and their counsel" and that he may have provided DLC Studios and LaChapelle with privileged information or attorney work product. (Counterclaims ¶ 58). In particular, on April 15, 2013, LaChapelle and DLC Studios requested that this Court issue an order of attachment against Torres—and particularly as to his New York real property—claiming that Torres was liquidating his assets in an attempt to frustrate any judgment that LaChapelle and DLC Studios might eventually obtain in this matter. (Dkt. Nos. 34-35). In support, they submitted Anderson's declaration which attested, among other things, to Torres's efforts to sell certain real property in New York, California, and Germany; his personal expenses and spending habits; and information regarding the precise dollar amounts of FTC's debts. (Dkt. No. 38). Torres and FTC claim that Anderson obtained this information while serving as a financial officer to FTC and as Torres's personal bookkeeper, and that providing this declaration was a misappropriation of this confidential information and a breach of his fiduciary duties.[5] (Torres/Anderson Decl. ¶¶ 14-17).

Anderson and Torres dispute the extent to which Anderson has contacts with New York, particularly as to Anderson's role and degree of involvement with FTC operations and Torres's finances. Anderson claims his role was limited and his contacts with New York are minimal: he is a California resident, is registered to vote and paying taxes in that state, and conducts his business from California. (Anderson Decl. ¶ 3). He does not own property in New York or hold assets in state; does not pay taxes, receive government benefits, or vote in New York; does not own or operate businesses in New York; does not have a New York bank account, office, mailing address, drivers license, telephone number, or fax number; and he has never availed himself of the New York court system. (Anderson Decl. ¶ 6).

---

[5] The Court notes that the Counterclaims do not actually assert a breach of fiduciary duty claim and the claim against Anderson is styled as for "conver[sion]." (Counterclaims ¶ 58).

Anderson concedes that he was a salaried employee of FTC from March 2008 through November 2008, but claims he has not been an employee of FTC since December 1, 2008, and that he never had managerial authority over FTC. (Anderson Decl. ¶ 4). Rather, he characterizes himself as a "freelance bookkeeper," having worked as such for FTC until approximately 2007. (Anderson Decl. ¶¶ 7-8). After 2007, he claims he worked primarily to oversee Torres's finances including managing his properties, reviewing FTC and Torres's bank accounts, keeping track of Torres's bills, and overseeing "certain real estate transactions," all of which he did from California. (Anderson Decl. ¶ 8). However, he provided bookkeeping assistance to FTC while staying at a New York City apartment from roughly July 2011 through June 2012, and was paid as an independent contractor for this work. (Anderson Decl. ¶¶ 9-10). After this period he returned to California, where he had maintained a residence, and continued to work part time for Torres and FTC until approximately March 2013. (Anderson Decl. ¶¶ 10, 14).

Torres disputes Anderson's characterization of his limited involvement with FTC. First, as to Anderson's 2008 employment with FTC, Torres attests that Anderson was the "Operations Manager," a position analogous to Chief Financial Officer, with complete supervisory authority over FTC's financial employees, oversight over all of FTC's financial activities, and was in daily communication with FTC's New York office and with Torres. (Torres/Anderson Decl. ¶¶ 4-7). Similarly, as to the period that Anderson lived in New York in 2012 and 2013, Torres notes that Anderson was working for FTC on a full-time basis, including to convert FTC's Quickbooks files to an Apple platform, and to prepare FTC's tax returns. (Torres/Anderson Decl. ¶ 7). Likewise, he claims that Anderson was his personal financial advisor until 2013, including with respect to his purchase and sale of the California, Germany, and New York properties; as to the New York property, Anderson also acted to manage certain aspects of that property.

15

(Torres/Anderson Decl. ¶ 8).  Torres claims that Anderson undertook these activities with an understanding that he would keep Torres's financial information in confidence. (Torres/Anderson Decl. ¶ 9).

As to the events giving rise to this litigation and the claims against Anderson, Torres attests that Anderson accompanied him to a meeting with LaChapelle in New York in March 2012 and, even after litigation was filed, continued to act as an advisor to FTC including in communications with Torres's counsel.  (Torres/Anderson Decl. ¶¶ 10-11; *see also* Schoenberg Decl. ¶¶ 2-8).  Anderson attempts to minimize his interactions with Torres's counsel, but admits that he made inquiries regarding the likely cost of litigation and attachment procedures in New York.  (Anderson Reply Decl. ¶ 4(e) ("Torres requested me to ask about . . . the possibility of an attachment if Torres sold certain real property and I contacted [counsel] solely with respect to those issues")).  Torres also points to Anderson's seemingly abrupt decision to end his relationship with Torres and FTC, which occurred a few days before the attachment request and was accomplished through an email stating "Please remove my email access from the server immediately as I will no longer be checking it."  (Torres Decl. ¶ 13).  Finally, Torres also submits evidence that Anderson may have consulted Torres financial information, including Quickbooks files, in the course of preparing the declaration submitted in connection with LaChapelle and DLC Studio's request for an attachment.  (Torres Decl. ¶¶ 14-16; Barak Decl.).

### B.  Long-Arm Jurisdiction

Counterclaim Plaintiffs' effort to secure jurisdiction over Anderson relies primarily on C.P.L.R. § 302(a)(1), which provides, among other things, for jurisdiction over claims arising from the "transact[ion] of business" in New York.  To establish jurisdiction under this provision, the defendant must have transacted business within the state and the claim asserted must arise

16

from that business activity. *Licci*, 732 F.3d at 168.

The New York Court of Appeals has held that whether a defendant "transacted business" in New York is a fact-intensive inquiry into whether the defendant has "purposefully availed itself of the New York forum" and requires courts to closely examine the defendant's contacts for their quality. *Id.*; *Centrifugal Force, Inc. v. Softnet Commun., Inc.*, No. 08-cv-5463, 2009 U.S. Dist. LEXIS 37084, at *10-11 (S.D.N.Y. Apr. 17, 2009) (noting that purposeful activities are those in which a defendant, through volitional acts, avails itself of the privilege of conducting activities in the forum state); *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 16 (1970) (noting the intent of the legislature to extend jurisdiction to nonresidents who have engaged in purposeful activity in New York). Among the factors that courts consider in making this assessment are

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).

Here, reviewing the facts in the light most favorable to Torres and FTC, the Court concludes that Anderson transacted business in New York and purposefully availed himself of the New York forum. Anderson had a years-long relationship with FTC, a New York corporation, and was an FTC employee for roughly half a year in 2008. *See, e.g.*, *Three Five Compounds, Inc. v. Scram Techs., Inc.*, No. 11-cv-1616, 2011 U.S. Dist. LEXIS 134530, at *29-31 (S.D.N.Y. Nov. 21, 2011) (noting that "courts in this district have found personal jurisdiction where parties' communications were part and parcel of an extended relationship involving

multiple transactions or the provision of services over multiple years."); *Assil Gem Corp. v. Greyhound Leisure Servs.*, 2000 U.S. Dist. LEXIS 4735, at *9-10 (S.D.N.Y. Apr. 11, 2000); *Centrifugal Force, Inc. v. Softnet Commun., Inc.*, 2009 U.S. Dist. LEXIS 37084, at *12; *Studio A Entm't., Inc. v. Direct Distribs., LLC*, No. 06-cv-02275, 2007 U.S. Dist. LEXIS 9449, at *20 (S.D.N.Y. Feb. 8, 2007) (holding that even in the absence of a written contract, an ongoing business relationship to sell DVDs in New York and repeated contacts in New York were sufficient to give rise to jurisdiction.); *SmartPros, Ltd. v. Straub*, 24 A.D.3d 653, 653-54 (N.Y. App. Div. 2d Dep't 2005).   Even after that employment relationship ceased, Torres and FTC allege that Anderson continued to maintain this relationship with FTC and to perform financial services for FTC.   Moreover, Anderson actually lived in New York for roughly a year in July 2011 through June 2012 while performing services for FTC on a full-time basis, albeit in the absence of a formal employment agreement. *See, e.g.*, *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 205-06 (S.D.N.Y. 2002) (noting that as part of ongoing relationship, defendants regularly communicated with New York corporation and made periodic visits to New York); *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 226-27 (S.D.N.Y. 2003) (noting several occasions in course of relationship where defendant visited individuals to discuss the ongoing business relationship).   Even after returning to California, he continued to provide bookkeeping assistance to FTC and Torres.

In addition, Anderson also provided services to Torres that bear a substantial connection to New York.  According to Torres, Anderson was his personal bookkeeper for years.   As particularly pertinent to this action, Torres owned a New York City property—eventually the subject of the attachment proceedings in this case—which Anderson helped manage.  Moreover, as to this property, Anderson is alleged to have been involved in the efforts to sell that property

and in discussing the possible legal implications of such a sale with Torres's attorneys.

The Court must assess whether, at this stage, Torres and FTC have satisfied their burden of showing that the claim against Torres for the misappropriation of Torres and FTC's confidential financial information arises out of this transaction of business. Courts making this inquiry assess whether there is an "articulable nexus" between the business transaction and the cause of action or, put differently, a "substantial relationship" between the transaction and the claim asserted. *Thorsen v. Sons of Nor.*, No. 13-cv-2572, 2014 U.S. Dist. LEXIS 15283, at *22 (E.D.N.Y. 2014). This standard does not require a "causal link between the defendant's New York business activity and a plaintiff's injury" but instead merely requires a relatedness such that the claim is not "completely unmoored" from the business activity. *Licci*, 732 F.3d at 168-69; *see also Symmetra Pty Ltd v. Human Facets, LLC*, No. 12-cv-8857, 2013 U.S. Dist. LEXIS 83428, at *14-15 (S.D.N.Y. June 13, 2013). However, "[a] connection that is 'merely coincidental' is insufficient to support jurisdiction." *Thorsen*, 2014 U.S. Dist. LEXIS 15283, at *22.

In this case, the claim against Anderson bears the requisite connection to his transaction of business in New York because, absent his activities for FTC and Torres, he would not have had access to the confidential information at issue. *See, e.g.*, *LeCroy Corp. v. Hallberg*, No. 09-cv-8767, 2010 U.S. Dist. LEXIS 107842, at *11 (S.D.N.Y. Oct. 1, 2010) ("LeCroy's claims arise out of Hallberg's alleged breach of the Confidentiality Agreement and misappropriation of confidential information that he acquired during his employment with LeCroy"); *Afloat in Fr., Inc. v. Bancroft Cruises Ltd.*, No. 03-cv-917, 2003 U.S. Dist. LEXIS 18703, at *20-21 (S.D.N.Y. Oct. 20, 2003); *Opticare Acquisition Corp. v. Castillo*, 25 A.D.3d 238, 246-47 (N.Y. App. Div. 2d Dep't 2005) ("Simply put, the appellants could not conduct any business for Wise, in New

York or elsewhere, without the confidential information  they allegedly misappropriated.");

*SmartPros, Ltd.*, 24 A.D.3d 653, 654; *Olympus Am., Inc. v. Fujinon, Inc.*, 8 A.D.3d 76, 77 (N.Y.

App. Div. 1st Dep't 2004) ("It was during the course of his 17-year employment with the New

York-based plaintiff that Cisco acquired the allegedly confidential proprietary information that is

the subject of this lawsuit."); *Samuel-Rozenbaum USA, Inc. v. Felcher*, 292 A.D.2d 214, 214-15

(N.Y. App. Div. 1st Dep't 2002) (holding that personal jurisdiction existed over claim "that

plaintiff abused his position of trust during his tenure in plaintiff's employ to misappropriate

secret or confidential information and has subsequently utilized that information to solicit

plaintiff's clientele").  For instance, as to FTC, Counterclaim Plaintiffs have made out a sufficient

prima facie case that Anderson obtained the information about FTC's debts from his access to

the company's financial records, including Quickbooks, obtained during the course of his

business relationship with FTC.  Similarly, Anderson's knowledge of Torres's financial habits

and, in particular, his efforts to sell his New York-based property arise directly out of his

involvement with handling Torres's finances and the sale of that property.  Although Torres and

FTC have not alleged a formal employment or confidentiality agreement, they have alleged that

Anderson owed them fiduciary duties and that his business relationship with them was premised

on an understanding that this information would be kept confidential.

## IV. DUE PROCESS

Both Hynd and Anderson contend that even if they are subject to jurisdiction under New

York law, the exercise of jurisdiction does not comport with the United States Constitution

because it would violate their rights to due process.  Personal jurisdiction requires the plaintiff to

allege that (1) the defendant has "certain minimum contacts" with the forum and (2) the exercise

of jurisdiction is reasonable under the circumstances.  *O'Neill v. Asat Trust Reg. (In re Terrorist*

*Attacks on September 11, 2001 (Asat Trust Reg.))*, 714 F.3d 659, 673 (2d Cir. 2013).  A stronger

showing of reasonableness may lessen the showing of minimum contacts that would otherwise

be required.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Neither Hynd nor Anderson argues they do not bear the requisite "minimum contacts"

with New York to satisfy due process (Hynd Mot. at 9; Anderson Mot. at 17) and, regardless, the

Court finds that this element is met.  In particular, these minimum contacts exist where the

defendant has "purposefully directed" his activities at residents of the forum and the litigation

results from alleged injuries arising out of those activities.  *O'Neill v. Asat Trust Reg. (In re*

*Terrorist Attacks on September 11, 2001 (Asat Trust Reg.))*, 714 F.3d at 674; *LeCroy Corp.*,

2010 U.S. Dist. LEXIS 107842, at *12 (noting that minimum contacts exist when a defendant

should reasonably anticipate being haled into court in the forum state).  As to Hynd, she is

alleged to have played an extensive management role in the New York-based DLC Studios,

communicated extensively with New York regarding that business, and—as detailed above—

either committed or caused others to commit tortious acts in New York.  *See, e.g.*, *O'Neill v. Asat*

*Trust Reg. (In re Terrorist Attacks on September 11, 2001 (Asat Trust Reg.))*, 714 F.3d at 674

("Put another way, specific personal jurisdiction properly exists where the defendant took

'intentional, and allegedly tortious, actions . . . expressly aimed' at the forum." (quoting *Calder*

*v. Jones*, 465 U.S. 783, 789 (1984)); *Water Res. Group, LLC v. Powers*, No. 12-cv-3779, 2013

U.S. Dist. LEXIS 131348, at *13-14 (E.D.N.Y. Aug. 19, 2013); *Animal Sci. Prods. v. Hebei*

*Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, No. 05-cv-453, 2012 U.S. Dist. LEXIS

187063, 40-44 (E.D.N.Y. Aug. 7, 2012); *Emerald Asset Advisors*, 895 F. Supp. 2d 418, 434-35.

With regard to Anderson, the same facts that give rise to the conclusion that he transacted

business in New York and provided confidential information acquired from a New York

corporation and pertaining to New York financial activities suffice to show these minimum

contacts exist. *See, e.g.*, *Thorsen*, 2014 U.S. Dist. LEXIS 15283, at \*27-28 (noting that the

minimum contacts inquiry substantially overlaps with the transaction of business inquiry);

*Opticare*, 25 A.D.3d 238, 247 (N.Y. App. Div. 2d Dep't 2005) ("Manifestly, [due process

concerns regarding minimum contacts are] not present where, as here, a defendant has

purposefully directed its activities toward the forum, and has created continuing obligations

between itself and forum residents"); *cf. Licci*, 732 F.3d at 170 (noting that it will be the rare

case where minimum contacts do not exist despite the transaction of business)

Instead, both Hynd and Anderson claim that the exercise of jurisdiction in New York

would be unreasonable because it would work a severe hardship on them. Hynd argues that the

litigation against her is retaliatory, that her job at DLC is demanding and that travel would

interfere with her work, and that "time-consuming, stress-inducing litigation would compromise

her ability to parent" her seven year old daughter. (Hynd Mot. at 9; *cf.* Hynd Decl. ¶ 2 (noting

that Hynd has a "husband and young daughter")). Anderson submits that the litigation against

him is intended to pressure the other third parties and that, because he is not currently employed

full time he cannot afford counsel or to travel to New York for court appearances and

depositions. (Anderson Mot. at 17).

The burden is on the defendants to present a "compelling case" that jurisdiction would be

unreasonable. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d

Cir. 1996). The Court considers five factors in assessing the reasonableness of jurisdiction:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2)
> the interests of the forum state in adjudicating the case; (3) the plaintiff's interest
> in obtaining convenient and effective relief; (4) the interstate judicial system's
> interest in obtaining the most efficient resolution of the controversy; and (5) the
> shared interest of the states in furthering substantive social policies.

*Id.*

The balance of these factors favors the exercise of jurisdiction in New York. As to the first factor, Anderson and Hynd's arguments apply to many—if not most—out-of-state litigants and they have not shown that these considerations would work an especially severe hardship on them. That litigation is stressful and time consuming, expensive or may require the party to proceed *pro se*, or may require some travel or time away from family does not inexorably rise to the level of a constitutional violation or render the proceedings fundamentally unfair. *See, e.g.*, *Thorsen*, 2014 U.S. Dist. LEXIS 15283, at *31 (generalized complaints of inconvenience are not sufficient to show jurisdiction is unreasonable); *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 168 (S.D.N.Y. 2010) (noting the conveniences of modern communication make having to travel across state lines only a slight burden); *United States v. Sutton*, No. 04-cv-00596, 2005 U.S. Dist. LEXIS 1349, at *5-6 (D. Conn. Jan. 10, 2005) (finding no due process violation to requiring a disabled, unemployed individual to travel from Massachusetts to Connecticut); *Parker Waichman Alonso LLP*, 2010 U.S. Dist. LEXIS 47957, at *33.

In contrast, it would be burdensome and inefficient to pursue separate litigation in multiple forums against Anderson and Hynd while an action arising out of the same basic facts is litigated in New York. *See Lis v. Delvecchio*, No. 11-cv-01057, 2012 U.S. Dist. LEXIS 113492, at *20-21 (D. Conn. Aug. 13, 2012); *Animal Sci. Prods. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 2012 U.S. Dist. LEXIS 187063, at *43-44 (E.D.N.Y. Aug. 7, 2012). Moreover, New York has an interest in adjudicating alleged torts committed in state and, particularly, against FTC, a New York corporation. *See Allied Dynamics Corp. v. Kennametal, Inc.*, No. 12-cv-5904, 2013 U.S. Dist. LEXIS 126140, at *49-50 (E.D.N.Y. Sept. 4, 2013); *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 584-85 (E.D.N.Y. 1998).

## V.  CONCLUSION

Hynd and Anderson's motions to dismiss for lack of personal jurisdiction are DENIED. This decision resolves docket numbers 85 and 104.  Discovery in this matter is ordered to continue pursuant to the schedule previously set by the Court.


SO ORDERED.

Dated: February  20  , 2014
      New York, New York

                                 ALISON J. NATHAN
                       United States District Judge